***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Taylor. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Taylor.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission had jurisdiction over the subject matter of this case, the parties were properly before the Full Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The employer-employee relationship existed between the defendant-employer and the plaintiff at all relevant times herein.
3. The carrier on the risk was Dennis Insurance Group at all relevant times herein.
4. Plaintiff's average weekly wage on October 20, 1999 was $354.78, March 28, 2000 was $379.61 and July 18, 2001 was $381.50.
5. The dates of the accepted injuries are October 20, 1999 (I.C. File No. 046232), March 28, 2000 (I.C. File No. 027646) and July 18, 2001 (I.C. File No. 159141).
6. All medical records and reports relating to treatment of plaintiff's injury or any relevant pre-existing injury or condition may be submitted into evidence.
7. The parties submitted into evidence as Stipulated Exhibit 1, a packet of plaintiff's medical records.
8. The parties submitted into evidence as Stipulated Exhibit 2, a November 21, 2002 medical report from Dr. Geissele.
9. The parties submitted into evidence as Stipulated Exhibit 3, defendants' supplemental discovery responses.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 58-year-old female, born April 11, 1945. Plaintiff completed the tenth grade and was trained in hotel management.
2. Defendant-employer is in the business of making cardboard boxes from pre-made cardboard. Plaintiff was first employed with defendant-employer from June 3, 1997 through August 25, 1997. Plaintiff was reemployed by defendant-employer on April 7, 1998 and worked through September 25, 2001. Prior to working with defendant-employer plaintiff was employed with K-Mart as a cashier and with Texaco as a cashier. Prior to that plaintiff was employed as quality control person for Motorola for approximately seventeen years.
3. During plaintiff's employment with defendant-employer, plaintiff worked as a finisher putting boxes through a machine and ensuring that they were glued correctly, loading the machine as well as pre-folding cardboard and pulling flaps.
4. During plaintiff's second employment with defendant-employer from April 7, 1998 through September 25, 2001, plaintiff sustained three compensable injuries.
5. On October 20, 1999, plaintiff hit her left knee on a roller. This injury was accepted as compensable. Plaintiff's average weekly wage was $354.78, yielding a compensation rate of $236.53. Plaintiff received temporary total disability benefits for all time she was completely out of work and temporary partial disability benefits for all the time she earned reduced wages related to this injury. (I.C. File No. 046232).
6. Plaintiff was treated conservatively for her October 20, 1999 compensable injury and was released at maximum medical improvement on January 19, 2000 with no permanent partial disability.
7. On March 28, 2000, plaintiff sustained a second compensable injury when she was struck in the head by a tow motor. Defendants accepted plaintiff's claim as compensable. At the time of this incident plaintiff's average weekly wage was $379.61, yielding a compensation rate of $253.09. Plaintiff received temporary total disability benefits until her return to work in April 2000. (I.C. File No. 027646).
8. Following plaintiff's March 28, 2000 compensable injury, plaintiff had increased complaints of back and leg pain as well as right hip pain.
9. Plaintiff has a history of two lumbar surgeries that occurred in the late 1980s prior to her employment with defendant-employer. Plaintiff continued to have chronic residual right leg pain and some hip and calf pain following these surgeries, but had been employed in regular and gainful employment. Plaintiff was able to perform her job with defendant-employer despite these previous surgeries in the late 1980s.
10. Following plaintiff's March 28, 2000 compensable injury, she sought treatment with Dr. Marchese, a board-certified neurologist. At plaintiff's request, she was returned to work on full duty on April 3, 2000. Soon thereafter, plaintiff experienced increased pain in her back, right hip and leg. A May 1, 2000 MRI of plaintiff's lumbar spine revealed a very tight stenosis between L3-4 and L4-5; stenosis above her previous decompression; L4 and L5 stenotic changes across the canal and indented into the spinal sac and right-sided nerve roots at L3-4 and L4-5 with complete tension. The MRI also revealed a slippage between the 4th and 5th vertebrae. Following a lumbar myelogram and CT scan, on May 26, 2000, plaintiff underwent a L3-4 and L4-5 decompression from the right side with undercutting across the canal performed by Dr. Marchese.
11. Plaintiff continued to experience dull aching pain in both legs with radiation into the thigh following her surgery. On September 21, 2000, plaintiff presented to Dr. Marchese for a final visit. At that time, Dr. Marchese opined that plaintiff could perform sedentary work with sitting or changing positions frequently and a minimum of lifting. Dr. Marchese further opined that plaintiff should not have a job where lifting and bending were performed all day. At that time, Dr. Marchese opined that plaintiff was anxious and suffered from some motivation problems. He referred plaintiff to Dr. Andrea Stutesman, a physiatrist.
12. Plaintiff presented to Dr. Stutesman on August 24, 2000. Dr. Stutesman referred plaintiff to Dr. Gary Indenbaum for a neuropsychological exam. By December 20, 2000, plaintiff's memory was improving and her family stressors were decreasing. By January 17, 2001, plaintiff was ready to gradually return to work. Dr. Stutesman kept plaintiff out of work from August 24, 2000 through January 7, 2001. Dr. Stutesman opined that plaintiff was clinically depressed when she presented to her initially, but by January 10, 2000 was making efforts to perform exercises and to stop taking narcotics, and that as early as December 20, 2000, plaintiff was presenting with an improved affect.
13. Dr. Stutesman opined that plaintiff had pre-existing problems with her lower back; her March 28, 2000 compensable injury aggravated her condition and this aggravation necessitated surgery occurring sooner than it would have without the compensable injury. This is true even though plaintiff would have more likely than not eventually required surgery for her condition even without her compensable injury.
14. As of January 17, 2001, Dr. Stutesman opined that plaintiff was at maximum medical improvement and retained a 5% permanent partial impairment of the back. Dr. Marchese also opined that plaintiff retained a 5% permanent partial impairment to her back.
15. Dr. Marchese opined that plaintiff's back problems requiring surgery would have eventually happened without her March 28, 2000 compensable injury, but that plaintiff's compensable injury aggravated and accelerated her condition. He further opined that plaintiff's 5% permanent partial impairment to the back was caused by her March 28, 2000 compensable lumbar strain. Dr. Marchese opined that plaintiff had a different pain after her compensable March 28, 2000 injury than she did prior to that injury.
16. Plaintiff returned to work on or about January 17, 2001 for half days for one week and then full days at regular duty beginning January 22, 2001. Plaintiff was told that her job could be "self-modified" to accommodate her restriction of lifting 25 to 30 pounds.
17. On July 18, 2001, plaintiff sustained a third compensable injury by accident when cardboard slid and hit plaintiff behind the knees causing her to fall on to her knees. At the time of the incident, plaintiff's average weekly wage was $381.50, yielding a compensation rate of $254.35. Defendants accepted this claim as compensable, and plaintiff received temporary total disability benefits until she returned to work in August 2001. (I.C. File No. 159141).
18. Plaintiff treated with Hart Industrial Clinic on July 18, 2001, complaining of pain in both knees. Plaintiff returned on July 23, 2001 complaining of continued knee pain and "give way" of the right knee.
19. Plaintiff continued to experience knee pain and give way and was referred by defendants to Dr. Alfred Geissele, a board-certified orthopedic surgeon. Prior to being seen by Dr. Geissele, plaintiff's knees gave out when she was in the bathroom and she fell on the bathtub. Plaintiff was also experiencing foot numbness.
20. On September 25, 2001, following her July 18, 2001 fall, plaintiff was working with defendant-employer as a finisher. This position had been informally modified for plaintiff to meet her physical restrictions from her March 28, 2000 compensable injury. Plaintiff's co-workers were helping her by pushing buggies and helping with heavy lifting.
21. On September 25, 2001, plaintiff was terminated by defendant-employer. Plaintiff was primarily terminated due to insufficient production, as her job was a production job. Defendants also contended that plaintiff was terminated due to attendance problems. However, it is clear that plaintiff had attendance problems during her first employment with defendant — employer due to the illness of her husband and was rehired. During her second employment with defendant-employer, plaintiff returned to work after each of her three compensable injuries. Plaintiff's absence levels were similar at the time of her termination as they had been throughout her employment. Defendants' contention that plaintiff was fired due to absenteeism is not accepted as credible. Plaintiff was also terminated due to layoffs throughout defendant-employer's company due to the volume of business.
22. Plaintiff has not been employed since her September 25, 2001 termination by defendant-employer.
23. From her September 25, 2001 termination by defendant-employer up until her May 6, 2002 surgery by Dr. Geissele, plaintiff looked for work, primarily as a cashier so that she could sit and stand. Plaintiff also applied at Clayton Marcus Furniture for a sanding job. Plaintiff was not hired at any of the places she applied.
24. On October 17, 2001, plaintiff presented to Dr. Geissele. An October 29, 2001 MRI of the lumbar spine revealed degenerative spondylolisthesis at L4-5, moderately advanced degenerative disc disease at this level, and a right L4-5 disc protrusion. Dr. Geissele opined that the October 29, 2001 MRI differed from the one taken on May 1, 2000 (following her March 28, 2000 compensable injury) in that the 2001 MRI revealed a right-sided extradural defect, which is larger than on the earlier study. Dr. Geissele further opined that it was more likely than not that the October 29, 2001 MRI revealed a new herniated disc and was not related to the earlier disc bulge contained in the earlier film. Dr. Geissele opined that based upon plaintiff's MRI and her symptoms of leg weakness, pain and numbness of the legs, that plaintiff's disc herniation caused weakness in plaintiff's legs.
26. On May 6, 2002, plaintiff underwent a revision of the right L4-5 hemilaminotomy, facetectomy and diskectomy, revision of the left L4-5 medial facetectomy, hemilaminotomy; posterolateral fusion of L3-4, L4-5 and L5-S1; posterior lumbar interbody fusion of L4-5; insertion of intervertebral cages L4-5; posterior segmental spinal instrumentation to the sacrum; left posterior iliac crest bone graph harvest, morseliced autologous; and insertion epidural catheter for post operative analgesia.
27. Dr. Geissele opined that plaintiff's surgery was necessitated by her stenosis and her disc herniation. Dr. Geissele also opined that plaintiff's disc herniation occurred at her compensable July 18, 2001 fall. He was of the opinion that plaintiff's trauma on that date caused her herniated disc and that her condition was not caused by her progressive back problems. Dr. Geissele further opined that plaintiff's herniated disc was distinct from the prior disc bulging and was caused by her compensable July 18, 2001 fall.
28. Dr. Geissele opined that from the time of plaintiff's compensable July 18, 2001 injury up to the time of her May 6, 2002 fusion, plaintiff was only able to perform work in the sedentary range. Dr. Geissele further opined that plaintiff was completely unable to work following the fusion surgery up through and including the time of his deposition in late 2002.
29. On November 21, 2002, Dr. Geissele opined that plaintiff had reached maximum medical improvement and has a permanent partial impairment of 30% of the back related to her July 18, 2001 compensable injury. Plaintiff was given permanent restrictions of minimizing bending and twisting, no lifting over 20 pounds, frequent position changes from sitting to standing as needed, no crouching, crawling, stooping and no working on elevated surfaces. Plaintiff should be restricted to sedentary work or less.
30. On July 18, 2001, plaintiff sustained a compensable injury to her back.
31. As a direct and proximate result of plaintiff's compensable injury, plaintiff sustained leg weakness and pain and a herniated disc.
32. Plaintiff's May 6, 2002 surgery performed by Dr. Geissele was proximately caused by her July 18, 2001 compensable injury.
33. As a direct and proximate result of plaintiff's July 18, 2001 compensable injury, plaintiff has been unable to earn the wages she was earning at the time of her compensable injury in the same or in any other employment.
34. On July 18, 2001, plaintiff earned an average weekly wage of $381.50, yielding a compensation rate of $254.35.
35. Plaintiff is entitled to receive temporary total disability compensation for the period from September 25, 2001 and continuing at the rate of $254.35 per week.
36. Plaintiff is entitled to have defendants provide all medical treatment necessitated by her July 18, 2001 compensable injury to the extent it tends to effect a cure, give relief or lessen plaintiff's disability. This includes all treatment provided in the past or directed in the future by Dr. Geissele.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. As a direct and proximate result of plaintiff's March 28, 2000 compensable injury, plaintiff sustained a compensable injury to her back, leg weakness, pain and a herniated disc on July 18, 2001. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's May 6, 2002 surgery performed by Dr. Geissele was proximately caused by her July 18, 2001 compensable injury.
3. As a result of her compensable injury by accident, plaintiff is entitled to temporary total disability compensation at the rate of $254.35 per week for the period beginning September 25, 2001 and continuing. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the July 18, 2001 compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. This includes all treatment provided in the past or directed in the future by Dr. Geissele. N.C. Gen. Stat. §§ 97-2(19),97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendant shall pay temporary total disability compensation to plaintiff at the rate of $254.35 per week for the period from September 25, 2001 and continuing. Compensation due which has accrued shall be paid in a lump sum subject to attorney's fees hereinafter provided.
2. A reasonable attorney's fee in the amount of twenty-five percent of the compensation due plaintiff under paragraph one of this award is approved for plaintiff's counsel. Thereafter, every fourth check shall be deducted from the sum due plaintiff and paid directly to his counsel.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury of July 18, 2001 for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
4. Defendants shall pay the costs of this action.
This the 29th day of December, 2003.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER